UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| MA. PATROCINIO F. SALCEDO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:21-cv-01161-SEB-DLP |
| | ) | |
| RN STAFF INC., | ) | |
| MANUEL GARCIA, | ) | |
| RAMON VILLEGAS, | ) | |
| ANTONINA HASKINS, | ) | |
| ARVIN AMATORIO, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING DEFENDANT'S SECOND MOTION TO DISMISS**

Plaintiff Patrocinio Salcedo filed a Second Amended Complaint against her former

employer, RN Staff Inc., three of its corporate officers, and the company's immigration

attorney, Arvin Amatorio. Thereafter, Mr. Amatorio, who is proceeding *pro se*, moved to

dismiss the Second Amended Complaint insofar as it implicates him. We now consider

Mr. Amatorio's motion and his three arguments for dismissal—lack of personal

jurisdiction, failure to state a claim, and lack of subject matter jurisdiction.

## I.    FACTUAL BACKGROUND

The following facts are taken from Ms. Salcedo's Second Amended Complaint and

are accepted as true for purposes of this motion to dismiss.

## A.  THE PARTIES

Ms. Salcedo is a citizen of the Philippines, and at all relevant times, she has lived in Connecticut. Ms. Salcedo is a licensed physical therapist in Connecticut and New York. RN Staff is an Indiana company that provides physical therapy services to healthcare facilities across the country. Defendant Manuel Garcia is the President of RN Staff, Defendant Ramon Villegas is the Vice President for Human Resources for the company, and Defendant Antonina Haskins is the company's Immigration Liaison Officer. These three Defendants work at RN Staff's office in Indianapolis, Indiana. Mr. Amatorio is an attorney licensed to practice in New York and conducts business out of his office in New York City. Mr. Amatorio serves as outside counsel on immigration matters for RN Staff. In this role, Mr. Amatorio regularly provides immigration advice to RN Staff and its corporate officers, and routinely prepares immigration sponsorship documents for and on behalf of RN Staff and its beneficiary-employees. Mr. Amatorio sends these prepared documents to RN Staff and Mr. Garcia in Indiana via either email or the postal service, and he regularly communicates with the other Defendants in Indiana through emails, text messages, phone calls, and mail services. In payment for this work, Ms. Salcedo contends, Mr. Amatorio sends regular invoices to RN Staff in Indiana, and consequently, derives substantial revenue from his work in Indiana.

## B.  THE EMPLOYMENT-BASED VISA APPLICATION PROCESS

The crux of Ms. Salcedo's claims is that Defendants abused the immigration system to obtain her continuing labor, in violation of the Trafficking Victims Protection Act

("TVPA"). Before we turn to Ms. Salcedo's procedural and substantive allegations against Defendants, it will be helpful to provide an overview of the relevant immigration procedures.

"Under the Immigration and Nationality Act ("INA"), a United States employer can petition the federal government to allow a foreign national to work in the United States as an H–1B worker." *Panwar v. Access Therapies, Inc.*, 2015 WL 1396599, at *1 (S.D. Ind. Mar. 25, 2015). "An H–1B worker performs services in a specialty occupation that requires a bachelor's or higher degree and includes such professions as physical therapists." *Id.* Ms. Salcedo was working for her prior employer (not RN Staff) based on an H–1B visa. The INA sets out a "three-step process by which an alien who is already lawfully present in the United States through a nonimmigrant worker visa or status (commonly called H1-B) may become a permanent resident." *Musunuru v. Lynch*, 831 F.3d 880, 882 (7th Cir. 2016). "The first two steps are completed by the worker's employer so that the employer may hire the worker on a permanent basis, rather than the temporary basis permitted by the worker's H1-B status." *Id.*

The first step obligates the employer to "obtain a labor certificate from the Department of Labor that certifies that there are insufficient able, willing, qualified, and available workers, and that hiring the alien worker on a permanent basis will not adversely affect the wages or working conditions of similarly employed U.S. workers." *Id.* (citations omitted). Next, the employer must file, and the U.S. Citizenship and Immigration Services ("USCIS") must approve, "an immigrant visa petition that assigns the worker to one of the INA's immigrant visa preference categories for employment-

based permanent residency." *Id.* at 882−83 (citations omitted). One of these categories is for "an alien who is member of a profession holding an advanced degree or an alien of exceptional ability, commonly called EB-2." *Id.* at 884. The petition is "called an I-140 after the name of the form used to file the petition: Form I-140, Immigrant Petition for Alien Worker." *Id.* at 883 (citation omitted). "The worker does not receive a visa upon approval of the employer's I-140 petition, because there is a quota where only a certain number of visas are made available per country of origin each calendar quarter." *Id.* (citations omitted). "Instead, an approved I-140 petition makes the worker eligible to receive a visa once one becomes available." *Id.* "The third and final step must be completed by the worker: [s]he must apply for, and be granted, an adjustment of status to permanent resident." *Id.* (citation omitted). "The application is also called an I-485 after the form used to file the application: Form I-485, Application to Register Permanent Residence or Adjust Status." *Id.* (citation omitted). Relevant here, the INA provides that if a worker is approved for an EB-2 visa, the worker's family members can file their own Form I-485 applications for lawful permanent resident status.

### C. MS. SALCEDO'S IMMIGRATION PROCESS

On December 2, 2015, Mr. Villegas contacted Ms. Salcedo regarding a job opportunity as a physical therapist with RN Staff. Ms. Salcedo—who was then working under an H-1B visa for her former employer—was ultimately persuaded to join RN Staff because they promised to sponsor her for an EB-2 visa. The employment agreement was finalized on August 6, 2016, and included a provision requiring RN Staff to employ Ms.

Salcedo and sponsor her EB-2 immigrant visa in exchange for her working as a physical therapist for a term of 4,160 hours at a $41 hourly rate. If Ms. Salcedo did not finish the contractual term, the employment agreement provided that Ms. Salcedo would owe RN Staff $20,000 in liquidated damages.

Following the parties' execution of the employment agreement, RN Staff and Mr. Amatorio reviewed Ms. Salcedo's immigration documents, which indicated that her H-1B status with her previous employer had been extended until December 12, 2018. Ms. Salcedo was assured by Mr. Garcia and Mr. Villegas that they understood that RN Staff needed to file a Form I-140, a Form I-485, and a Form I-765 employment authorization application on her behalf before she could leave her then-employer, because Ms. Salcedo needed to maintain her nonimmigrant status—which she secured through her H1-B visa with her then-employer—at the time her Form I-485 application was filed. Mr. Garcia and Mr. Villegas also informed Ms. Salcedo that Mr. Amatorio would prepare these documents on her behalf, along with the immigration documents for her family members.

At some point thereafter, Mr. Amatorio prepared the referenced immigration documents and sent them to RN Staff's office in Indianapolis. On August 9, 2016, Ms. Haskins, the company's Immigration Liaison Officer, requested Ms. Salcedo's signature on the Form I-485 that Mr. Amatorio had prepared on her behalf. Ms. Haskins also instructed Ms. Salcedo to write and mail the following checks for transmission to Mr. Amatorio via RN Staff's office in Indianapolis: one check for $4,710 to cover the USCIS filing fee as well as several post-dated checks of $500 (each made payable to Mr. Amatorio). On September 23, 2016, Mr. Garcia signed the Form I-140 petition in his

capacity as RN Staff's President, and on September 27, 2016, Mr. Amatorio signed the petition in his capacity as RN Staff's immigration attorney. Mr. Amatorio filed the petition with USCIS on September 29, 2016.

Sometime in November of 2016, Ms. Haskins informed Ms. Salcedo that RN Staff had filed the Form I-140 petition on her behalf and sponsored her as an EB-2 physical therapist. On December 2, 2016, Ms. Haskins informed Ms. Salcedo that RN Staff would file her Form I-485 and Form I-765, as well as those for her family members, once they received her checks. It is unclear whether Ms. Salcedo sent these checks, but she does allege that Mr. Amatorio filed Ms. Salcedo's Form I-485 adjustment application on January 9, 2017.

Ms. Salcedo began working for RN Staff on April 10, 2017, having received her work permit card in March of 2017. Over the course of her term of employment with RN Staff, the company assigned Ms. Salcedo to work at various facilities in Connecticut and New York. Throughout most of her employment with RN Staff, Ms. Salcedo alleges, the company was underpaying her. Mr. Amatorio instructed the other Defendants to encourage Ms. Salcedo to continue to work for RN Staff, despite Mr. Amatorio's knowledge that RN Staff was underpaying her.

On February 20, 2018, USCIS denied RN Staff's Form I-140 petition filed on behalf of Ms. Salcedo because Defendants had "submitted a prevailing wage determination (PWD) that was valid from June 30, 2016, through September 28, 2016," which did not apply to the Form I-140 petition they filed on September 29, 2016. Docket No. 45, at 10. Because the PWD was invalid at the time the Form I-140 petition and accompanying

6

labor certification were filed, the petition had to be denied. Because Mr. Amatorio and RN Staff filed the Form I-140 petition a day too late, it was denied. None of the Defendants, however, informed Ms. Salcedo of this denial. In April of 2018, Ms. Salcedo checked her application status on the USCIS website and discovered that her Form I-140 had been denied. She immediately contacted Mr. Villegas regarding the denial, and he assured her that they were working with Mr. Amatorio to remedy the situation. Mr. Villegas informed Ms. Salcedo that the petition was denied because USCIS was now requiring a Doctor of Physical Therapy degree to qualify for EB-2 employment, a degree which Ms. Salcedo did not possess. Mr. Villegas encouraged Ms. Salcedo to avail herself of RN Staff's tuition fee assistance program for a Doctor of Physical Therapy degree but informed her that she would need to extend her employment contract with RN Staff another year if she did so. None of the Defendants would provide to Ms. Salcedo a copy of the denial decision from USCIS. She eventually learned that the denial was not based on her lack of a doctorate degree, rather on Mr. Amatorio's failure to timely file her petition. Ms. Salcedo claims that Defendants thus clearly misrepresented to her the true reason for the denial.

Ms. Salcedo also claims that Defendants failed to inform her of the consequences of Form I-140 denial, namely, that it would result in the denial of her family's Form I-485 adjustment applications as well as hers. On May 3, 2018, when Ms. Salcedo checked the status of her family's Form I-485 applications, she discovered that they also had been denied since Ms. Salcedo's underlying Form I-140 petition had previously been denied. Ms. Salcedo again contacted Mr. Villegas, who advised her that RN Staff and Mr.

Amatorio were working on a solution to her and her family's immigration problems. A week later, Mr. Villegas spoke to Ms. Salcedo about her Form I-140 and I-485 denials, and this time he informed her that RN Staff would re-file her Form I-140 petition if she extended her employment with the company. Mr. Villegas again advised Ms. Salcedo to enroll in a Doctor of Physical Therapy program, so she could be approved for EB-2 sponsorship. He also warned her that if the second I-140 petition was not filed, the denial would become permanent, and Ms. Salcedo would possibly be subject to deportation.

Ms. Haskins likewise encouraged Ms. Salcedo to apply for a Doctor of Physical Therapy program and extend her employment with RN Staff because, as Ms. Haskins claimed, this program was the only way for Ms. Salcedo's visa to get approved and prevent her from being deported. Ms. Haskins had been instructed by Mr. Amatorio to tell Ms. Salcedo that re-filing her Form I-485 was the only way to salvage Ms. Salcedo's "hopes of getting a green card and to forestall the possibility of deportation."[1] Docket No. 45, at 11. On May 16, 2018, Ms. Salcedo emailed Mr. Garcia to confirm what Mr. Villegas had told her regarding the extension of her employment agreement in exchange

---

[1] Mr. Amatorio contests this factual allegation, which states in full: "Upon information and belief, Amatorio had instructed Haskins in Indiana to advise Plaintiff that if Plaintiff did not proceed with the re-filing of her Form I-485 adjustment application, Plaintiff would allegedly become unlawfully present and would be subject to removal or deportation proceedings." Mr. Amatorio contends that this allegation is insufficient because it was "made 'on information and belief,' which can mean as little as 'on rumor.'" Docket No. 51, at 3 (quoting *Grenadyor v. Ukrainian Village Pharmacy, Inc.*, 772 F.3d 1102 (7th Cir. 2014)). In *Grenadyor*, however, the Seventh Circuit ruled that allegations made upon information or belief are insufficient in *fraud* cases, which are subject to the heightened pleading requirements of Federal Rule of Civil Procedure 9(b). 772 F.3d at 1108. Mr. Amatorio's reliance on *Grenadyor* is thus misplaced because Ms. Salcedo's allegation does not involve a claim of fraud; as even he admits, this statement was a "legal consequence" and not a "threat," neither of which is subject to Rule 9. Thus, Mr. Amatorio's challenge to the sufficiency of Plaintiff's allegations fails.

for RN Staff re-filing its Form I-140 petition on her behalf. Mr. Garcia, however, did not respond to her email. Instead, Mr. Villegas called Ms. Salcedo, again telling her to agree to the extension of her employment agreement because, if RN Staff did not re-file the Form I-140 and Form I-485, the denials would become final and Ms. Salcedo could be deported. "Because she was told the only way to salvage her immigration status was for RN Staff to re-file its I-140 petition," Ms. Salcedo "grudgingly agreed" to sign the extension. *Id.* at 12.

In June of 2018, Ms. Salcedo enrolled in a Doctor of Physical Therapy program at Shenandoah University. On June 15, 2018, Ms. Haskins sent an email to Ms. Salcedo, passing along Mr. Amatorio's instructions to sign additional immigration forms and mail them back to RN Staff's office in Indianapolis, which Ms. Salcedo did. Following Mr. Amatorio's review of these documents, Ms. Haskins explained to Ms. Salcedo that RN Staff would soon file the second Form I-140 petition and Form I-485 applications. Ms. Haskins once again instructed Ms. Salcedo to mail checks to their Indianapolis office for Mr. Amatorio, specifically, a check of $4,710 for the USCIS filing fee, and several post-dated checks of $500 each to cover Mr. Amatorio's legal fees.

Mr. Amatorio instructed Ms. Haskins to advise Ms. Salcedo that she could continue working for RN Staff on her extended work permit authorization, even though the underlying Form I-485 adjustment application had already been denied. Ms. Salcedo relied on this advice and on Defendants' assurances that filing the second Form I-140 petition and Form I-485 application would prevent her from being deported and secure her the desired permanent resident status. Mr. Villegas informed Ms. Salcedo that Mr.

Amatorio had a practice of routinely filing second Form I-140 petitions and Form I-485 applications after initial denials, and RN Staff's other beneficiary-employees had not had any problems continuing their work assignments with the company.

Although Ms. Salcedo has alleged that Mr. Amatorio filed the second Form I-140 petition, she has omitted any reference to the specific date he did so. Sometime during the second week of July 2018, Ms. Salcedo called Ms. Haskins to inquire as to the status of her family's Form I-485 applications and hers as well. On July 13, 2018, Ms. Haskins responded to Ms. Salcedo, advising her to review and sign a third version of the Form I-485 application. Only then did Ms. Salcedo realize that RN Staff had not yet filed those Form I-485 applications. Over the course of the ensuing months, Ms. Salcedo repeatedly inquired of Defendants regarding whether the Form I-485 applications had been filed, repeatedly requesting a copy of the second Form I-140 petition that they had allegedly filed. On October 23, 2018, Ms. Haskins finally emailed to Ms. Salcedo a copy of the second Form I-140 petition that had been filed on her behalf, informing her that the Form I-485 petitions had *not* yet been filed because Ms. Salcedo had failed to send the payment checks to Mr. Amatorio. Consistent with Mr. Amatorio's instructions to Ms. Haskins, she informed Ms. Salcedo that Mr. Amatorio was now requiring her to send three post-dated checks made payable to him in the amounts of $3,000, $1,500, and $675. Sometime during the last week of January 2019, as directed, Ms. Salcedo sent these checks properly designated for Mr. Amatorio to RN Staff's office in Indianapolis. After RN Staff forwarded them on to Mr. Amatorio, finally, on March 20, 2019, he filed the second round of Form I-485 applications on behalf of Ms. Salcedo and her family.

On July 16, 2019, USCIS denied the second Form I-140 petition filed on Ms. Salcedo's behalf. Ms. Haskins informed Ms. Salcedo of the denial but provided to her no explanation of the reasoning for the denial. On July 30, 2019, Ms. Salcedo emailed Mr. Garcia regarding the denial, informing him that she had heard reports of many other RN Staff petitions being denied, resulting in many other RN Staff employee-beneficiaries being sent back to their home countries. Mr. Garcia responded later that day, explaining that EB-2 filings were being regularly denied because USCIS was requiring the Doctor of Physical Therapy degree. He said he would contact Mr. Amatorio concerning their options for moving forward. Mr. Garcia never informed Ms. Salcedo of the true reasons USCIS denied the petition, which were: (1) RN Staff did not make the required job posting, or "Notice of Filing," in connection with Ms. Salcedo's employment, (2) the Notice of Filing that was submitted for RN Staff's I-140 petition was posted at the end-client, i.e., Northshore Rehab, and was also signed by the wrong person, Mr. Villegas, who was not an authorized representative of Northshore Rehab, (3) the RN Staff 2016 tax returns submitted were not sufficient to show that RN Staff had the ability to pay the proffered wages, (4) the job duties listed on the Notice of Filing and on the prevailing wage determination were significantly different, and (5) no experience verification letters were submitted to show that Ms. Salcedo had the required five years of experience.

Defendants, Ms. Salcedo claims, hid these true reasons from her and also failed to inform her that this denial would result in the denials of the Form I-485 applications for both her and her family. Ms. Salcedo repeatedly attempted to contact Defendants regarding the Form I-140 denial, but Ms. Salcedo never heard back from any of them. On

September 26, 2019, Ms. Salcedo sent Mr. Garcia her letter of resignation from RN Staff. Her second Form I-485 adjustment application, along with those of her family, were subsequently denied because the underlying Form I-140 petition had previously been denied.

On May 7, 2021, Ms. Salcedo filed her initial lawsuit against Mr. Amatorio and the other Defendants. In her Second Amended Complaint, Ms. Salcedo includes two claims against Mr. Amatorio under the Trafficking Victims Protection Act—Forced Labor, in violation of 18 U.S.C. § 1589, and Conspiring to Violate the Trafficking Victims Protection Act with the other Defendants, in violation of 18 U.S.C. § 1594. Specifically, Ms. Salcedo claims that Mr. Amatorio conspired with RN Staff to "abuse or misuse the law on immigration sponsorship by submitting a succession of frivolous immigration applications with the U.S. Citizenship and Immigration Services ("USCIS") on her behalf." Docket No. 45, at 1. Ms. Salcedo further claims that Defendants were able to obtain the benefits of her continuing labor by: (1) threatening her that if she did not have a second Form I-140 immigrant petition filed on her behalf, she could be subjected to possible deportation, and (2) misrepresenting to her that she could still allegedly secure her green card through the re-filing of her Form I-485 application. *Id.* Ms. Salcedo also has included a state-law legal malpractice claim against Mr. Amatorio based on these misdeeds.

12

## II.    DISCUSSION AND DECISION

Mr. Amatorio has moved to dismiss the Second Amended Complaint insofar as its claims implicate him, arguing that: (1) the court lacks personal jurisdiction over him, (2) Ms. Salcedo fails to sufficiently state a claim under the TVPA, and (3) the Court lacks subject matter jurisdiction over Ms. Salcedo's legal malpractice claim. We address each of these asserted grounds for dismissal in turn below.

### A.  PERSONAL JURISDICTION

"Federal Rule of Civil Procedure 12(b)(2) requires dismissal of a claim where personal jurisdiction is lacking." *Physicians' Med. Ctr., LLC v. CareSource*, 2020 WL 1139424, at *1 (S.D. Ind. Mar. 6, 2020) (Barker, J.). "While '[a] complaint need not include facts alleging personal jurisdiction,' once '[a] defendant moves to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating the existence of jurisdiction.'" *Id.* (quoting *Purdue Rsch. Found. v. Sanofi–Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003)). "When a district court rules on a defendant's motion to dismiss based on the submission of written materials, the plaintiff 'need only make out a *prima facie* case of personal jurisdiction.'" *Id.* (quoting *Purdue Rsch. Found.*, 338 F.3d at 782). All well-pleaded allegations are taken as true at this stage and any factual disputes are resolved in the plaintiff's favor. *Tamburo v. Dworkin*, 601 F.3d 693, 700 (7th Cir. 2010).

A determination of personal jurisdiction involves two steps. "First, the federal court must determine whether the 'long-arm' statute of the state in which it sits allows

jurisdiction and, second, decide whether the exercise of jurisdiction comports with due process." *Physicians' Med. Ctr.*, 2020 WL 1139424 at *2 (citing *NUCOR Corp. v. Aceros Y Maquilas de Occidente, S.A.*, 28 F.3d 572, 580 (7th Cir. 1994)). Indiana Trial Rule 4.4(A) serves as Indiana's long-arm provision and expands personal jurisdiction to the full extent permitted by the Due Process Clause of the Fourteenth Amendment. *See LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 967 (Ind. 2006). Accordingly, "the state statutory and federal constitutional inquiries merge." *Tamburo*, 601 F.3d at 700 (citation omitted). Under the Due Process Clause, we may "exercise personal jurisdiction over an out-of-state defendant if the defendant has 'certain minimum contacts with [Indiana] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 923 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

"Opinions in the wake of the pathmarking *International Shoe* decision have differentiated between general or all-purpose jurisdiction, and specific or case-linked jurisdiction." *Id.* at 919 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414, nn. 8, 9 (1984)). General jurisdiction exists where the defendant's contacts with the forum "are so continuous and systematic 'as to render it essentially at home in the forum State.'" *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014) (quoting *Goodyear*, 564 U.S. at 919). Specific jurisdiction, on the other hand, exists "if the defendant has 'purposefully directed' his activities at residents of the forum, and the litigation results from alleged injuries that 'arise out of or relate to' those activities." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (citations omitted). Neither party before the court in

this case argues that general jurisdiction applies here—indeed, Ms. Salcedo relies exclusively on the Court's authority to exercise specific jurisdiction over Mr. Amatorio. As such, we will analyze only whether Mr. Amatorio created the required "minimum contacts" with Indiana "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Goodyear*, 564 U.S. at 923 (quoting *Int'l Shoe*, 326 U.S. at 316).

Mr. Amatorio's specific jurisdiction challenge focuses almost exclusively on the fact that he did not travel to or have an office in Indiana, and thus did not establish the requisite "minimum contacts." This argument is a vestige of *Pennoyer v. Neff* and its historical conception of personal jurisdiction, which required a defendant's physical presence in a forum before jurisdiction could be exercised. 95 U.S. 714 (1887) (overruled by *Int'l Shoe*, 326 U.S. at 316). "In time, however, that strict territorial approach yielded to a less rigid understanding, spurred by 'changes in the technology of transportation and communication, and the tremendous growth of interstate business activity.'" *Daimler*, 571 U.S. at 126 (quoting *Burnham v. Superior Court of Cal., County of Marin*, 495 U.S. 604, 617 (1990)). Contrary to Mr. Amatorio's arguments, his lack of physical presence in the forum is not dispositive under modern precedent; rather, it is one of many relevant contacts a court may weigh when considering the "minimum contacts" necessary to create specific jurisdiction. Mr. Amatorio cites to *Walden v. Fiore*, yet seemingly misses the decision's introductory principle: "Although a nonresident's physical presence within the territorial jurisdiction of the court is not required, the nonresident generally must have certain minimum contacts . . . such that the maintenance of the suit does not offend

traditional notions of fair play and substantial justice." 571 U.S. 277, 283 (2014) (citations and quotation marks omitted).

To exercise jurisdiction consistent with modern due process requirements, "the defendant's suit-related conduct must create a substantial connection with the forum State." *Id.* at 284. "Specific personal jurisdiction is appropriate where (1) the defendant has purposefully directed his activities at the forum state or purposefully availed himself of the privilege of conducting business in that state, and (2) the alleged injury arises out of the defendant's forum-related activities." *Tamburo*, 601 F.3d at 702 (citing *Burger King*, 471 U.S. at 472). "The exercise of specific personal jurisdiction must also comport with traditional notions of fair play and substantial justice as required by the Fourteenth Amendment's Due Process Clause." *Id.* (citing *Int'l Shoe*, 326 U.S. at 316).

We begin our analysis of personal jurisdiction by examining whether Mr. Amatorio has in the context of this dispute purposefully directed his activities at Indiana or purposefully availed himself of the privilege of conducting business in the State. This requirement is meant to "ensure[] that a defendant will not be haled into a jurisdiction solely as a result of random, fortuitous, or attenuated contacts, or of the unilateral activity of another party or a third person." *Burger King*, 471 U.S. at 475 (internal quotation marks and citations omitted). "Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant *himself* that create a 'substantial connection' with the forum State." *Id.* (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). Thus, where a defendant has "purposefully reach[ed] out beyond their State and into another by, for example, entering a contractual relationship that envisioned

16

continuing and wide-reaching contacts in the forum State, or by circulating magazines to deliberately exploi[t] a market in the forum State," the defendant "manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well." *Walden*, 571 U.S. at 285 (internal citations and quotation marks); *Burger King*, 471 U.S. at 476. "And although physical presence in the forum is not a prerequisite to jurisdiction, physical entry into the State—either by the defendant in person or through an agent, goods, mail, or some other means—is certainly a relevant contact." *Walden*, 571 U.S. at 285 (citing *Burger King*, 471 U.S. at 476; *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 773−74 (1984)).

Here, our review causes us to conclude that Mr. Amatorio did, in fact, purposefully direct his activities at residents within the State of Indiana, and purposefully avail himself of the privilege of conducting business in the State. We emphasize: "Jurisdiction in these circumstances may not be avoided merely because the defendant did not physically enter the forum State." *Burger King*, 471 U.S. at 476. "Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted." *Id.* "So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State," the Supreme Court has "consistently rejected

the notion that an absence of physical contacts can defeat personal jurisdiction there." *Id.* (quoting *Keeton*, 465 U.S. at 774−75).

The allegations in the Second Amended Complaint establish that Mr. Amatorio transacted extensive business in Indiana through mail and wire communications. He directed that Ms. Salcedo's checks and prepared forms be sent first to Indiana to RN Staff personnel, and then forwarded by RN Staff to his office in New York. This routine and extensive use of the mail is a relevant physical contact with the State of Indiana. Mr. Amatorio's longstanding business relationship with RN Staff entailed Mr. Amatorio's "establish[ing] and maintain[ing] ongoing communications" with Indiana residents through his use of mail, telephone, and email.[2] *Purdue Rsch. Found.*, 338 F.3d at 785. Ms. Salcedo has alleged that Mr. Amatorio also purposefully directed the actions and communications of Ms. Haskins, an Indiana resident, who worked out of the RN Staff offices located here. Moreover, Ms. Salcedo has alleged that Mr. Amatorio routinely sent

---

[2] Mr. Amatorio argues that: "Email does not furnish a basis for 'minimum contacts'"; in support of this proposition, he cites to *Advanced Tactical Ordnance Systems, LLC v. Real Action Paintball, Inc.*, 751 F.3d 796 (7th Cir. 2014). In that case, however, the Seventh Circuit was considering whether a defendant who sent "two allegedly misleading emails to a list of subscribers that included Indiana residents" and maintained a website that was accessible in Indiana constituted minimum contacts with the State. *Id.* at 802−803. The Seventh Circuit noted that "it is exceedingly common in today's world for a company to allow consumers to sign up for an email list," and the panel was "not prepared to hold that this *alone* demonstrates that a defendant made a substantial connection to each state (or country) associated with those persons' 'snail mail' addresses." *Id.* at 803 (emphasis added). The Seventh Circuit further explained that it may "be different if there were evidence that a defendant in some way targeted residents of a specific state, perhaps through geographically-restricted online ads." *Id.* "But in such a case the focus would not be on the users who signed up, but instead on the deliberate actions by the defendant to target or direct itself toward the forum state." *Id.* Mr. Amatorio's argument to the contrary is meritless; his continuous use of email between himself and the other Defendants in Indiana is one of many relevant contacts, which evince the purposeful contact he himself established with the State.

18

his invoices to Indiana covering his work for RN Staff from which he derived significant revenues for this work that occurred in part in Indiana. In sum, we hold with little difficulty that Mr. Amatorio created "continuing obligations" between himself and Indiana residents, and "manifestly has availed himself of the privilege of conducting business" in the State of Indiana. *Burger King*, 471 U.S. at 476. He also purposefully directed his business activity at the State of Indiana and its residents. Having determined that Mr. Amatorio purposefully engaged in forum activities, we readily conclude that Ms. Salcedo's alleged injury also arose out of Mr. Amatorio's forum-related activities. *Tamburo*, 601 F.3d at 702.

Accordingly, Ms. Salcedo has met her burden to establish Mr. Amatorio's "minimum contacts" with the State of Indiana. We consider next whether an exercise of personal jurisdiction over him would "offend traditional notions of fair play and substantial justice." *Int'l Shoe*, 326 U.S. at 316 (internal quotation omitted). In doing so, we acknowledge that, with minimum contacts established, it is incumbent on Mr. Amatorio to "present a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Burger King*, 471 U.S. at 477. Mr. Amatorio, however, has advanced not a single relevant argument in response to this requirement, let alone a compelling basis on which the Court might find our exercise of jurisdiction over him to be unconstitutional. *Id.* at 482. Therefore, Mr. Amatorio's personal jurisdiction challenge is unavailing, and we deny his motion to dismiss on this ground.

### B.  FAILURE TO STATE A CLAIM

Mr. Amatorio next argues in support of his dismissal motion that, pursuant to Federal Rules of Civil Procedure 8 and 12(b)(6), Ms. Salcedo's TVPA claims fail to state a claim upon which relief can be granted. Under Federal Rule of Civil Procedure 8, a pleading must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8 requires plaintiffs to plead "enough facts to state a claim to relief that is plausible on its face" to avoid dismissal under Rule 12(b)(6). *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plausibility requires "more than a sheer possibility" of unlawful conduct; instead, the well-pleaded facts of a complaint must allow the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In Count I, Ms. Salcedo alleges a substantive forced labor claim under 18 U.S.C. § 1589, and in Count III, a conspiracy claim to violate 18 U.S.C. § 1589, pursuant to 18 U.S.C. § 1594. These causes of action provide for criminal penalties, but 18 U.S.C. § 1595(a) also provides that a victim may bring a civil action for damages and attorney's fees against "the perpetrator (or whoever knowingly benefits, financially or by receiving anything of value from participation in a venture which that person knew or should have known has engaged in an act in violation of this chapter)."

### i.  FORCED LABOR CLAIM

Count I is based on an alleged violation of 18 U.S.C. § 1589, which provides as follows:

> Whoever knowingly provides or obtains the labor or services of a person by any one of, or by any combination of, the following means—
>
> . . .
>
> (2) by means of serious harm or threats of serious harm to that person or another person;
>
> (3) by means of the abuse or threatened abuse of law or legal process; or
>
> (4) by means of any scheme, plan, or pattern intended to cause the person to believe that, if that person did not perform such labor or services, that person or another person would suffer serious harm or physical restraint
>
> [violates this subsection.]

18 U.S.C. § 1589(a). Ms. Salcedo has alleged that Mr. Amatorio committed acts in violation of all three of these subsections. The TVPA defines the term "serious harm" as any harm, "whether physical or nonphysical, including psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). The TVPA further defines the meaning of the third paragraph, "the abuse or threated abuse of law or legal process," to include the use or threatened use of "a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1).

Mr. Amatorio advances several arguments regarding the alleged insufficiency of Ms. Salcedo's 18 U.S.C. § 1589 claims, each of which we address in turn below.

## 1. CONCLUSORY ALLEGATIONS

First, he contends that Ms. Salcedo's allegations supporting her forced labor claim are conclusory, and that the paragraphs comprising Count I "present[] conclusory allegations, and formulaic restatements of the elements of a claim for forced labor." Docket No. 51, at 3. As such, he says, Count I "fails under *Iqbal*, because it is merely a formulaic recitation of the cause of action and nothing more." *Id.* (citing *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009)). In arguing this point, Mr. Amatorio relies on the holding in *Brooks v. Ross*, but there, the plaintiff's 42 U.S. § 1983 claim consisted of a single paragraph that generally alleged that the defendants had maliciously prosecuted the plaintiff in retaliation for the plaintiff exercising his constitutional rights. 578 F.3d at 582. The Seventh Circuit (correctly in our view) held that "this paragraph fails under *Iqbal*, because it is merely a formulaic recitation of the cause of action and nothing more. It therefore does not put the defendants on notice of what exactly they might have done to violate [the plaintiff's] rights under the Constitution, federal law, or state law." *Id.*

In contrast, Count I of Ms. Salcedo's Second Amended Complaint spans nearly twenty paragraphs, Paragraphs 160 through 179, re-alleging and incorporating the factual allegations contained in Paragraphs 1 through 27, Paragraphs 32 through 108, and Paragraphs 117 through 122 of the pleading. Ms. Salcedo's underlying factual allegations—as summarized above—are thorough, detailed, and specific. Mr. Amatorio's challenge to Paragraphs 160 through 179 of Count I of Ms. Salcedo's Second Amended Complaint misapprehends Rule 8(a) and other federal pleading requirements. Even though "Rule 8(a) does not require plaintiffs to 'pin' their claim for relief to any particular

legal theory at the pleading stage," Ms. Salcedo has devoted literally dozens of paragraphs in her Second Amended Complaint to explaining her legal theories. *Zimmerman v. Bornick*, 25 F.4th 491, 493 (7th Cir. 2022) (quoting *Skinner v. Switzer*, 562 U.S. 521, 530 (2011)). Her references to the essential legal elements of 18 U.S.C. § 1589 in Paragraphs 160 through 179 elaborate her legal basis for this lawsuit. Moreover, Ms. Salcedo has referenced numerous factual allegations in the course of explaining her legal theories. We agree that if Ms. Salcedo had alleged a single paragraph setting out her claim, devoid of any factual support, and lacking any explanation as to how Defendants wrongfully obtained her labor by means of one of the prohibited categories of activity, that would be a formulaic recitation of a cause of action prohibited by *Brooks* and our federal pleading requirements because it would not have put Defendants on notice of what precisely they are accused of having done to impermissibly obtain Ms. Salcedo's labor. 578 F.3d at 582. Ms. Salcedo, however, has provided the exact opposite of a barebones claim: her pleading, which spans a hundred factual allegations, is also buttressed by dozens of explanatory paragraphs as to the facts as well as each of her legal theories.

Mr. Amatorio also challenges in his motion to dismiss specific factual allegations, beginning with Paragraph 3 of the Second Amended Complaint, which states:

> By threatening Plaintiff that if she did not have a second Form I-140 immigrant petition filed in her behalf, she could be subjected to possible deportation, and by misrepresenting to Plaintiff that she could still allegedly secure her green card through the re-filing of Plaintiff's Form I-485 application, Defendants were able to subtly obtain the continuing labor or services of the Plaintiff.

Docket No. 45, at 1. Mr. Amatorio objects to the legal sufficiency of this paragraph on the grounds that it is "a conclusory and shotgun allegation claiming that all Defendants threatened the Plaintiff," and that the three opening words, "by threatening plaintiff," reflect a formulaic recitation of one of the elements of this cause of action. Docket No. 50, at 3. Paragraph 3, however, is a very clearly labeled part of Ms. Salcedo's "Preliminary Statement," included to explain her case and her ensuing causes of action under the TVPA. This introductory summary of Ms. Salcedo's Second Amended Complaint is clearly not, itself, a separate claim. Considered together with Ms. Salcedo's prolix factual allegations detailing the threats and actions of Defendants in abusing the immigration processes in order to coerce her continued labor, we reject Mr. Amatorio's attempt to secure the dismissal of this entire cause of action on so superficial and misleading a basis as he has proffered.

Mr. Amatorio also challenges the allegations in Paragraph 3 linking his actions to Ms. Salcedo's often ignored and entirely unresolved immigration status. He maintains that his legal representation cannot be construed as a threat aimed at causing her immigration harm. Our court, however, has rejected a similar argument made by Mr. Amatorio himself, in *Hernandez v. RN Staff Inc.*, 2021 WL 2012657 (S.D. Ind. May 20, 2021). There, he argued that "dismissal is required because he used the immigration process *for* Hernandez's benefit, not *against* Hernandez." *Id.* at *4. We expressed doubt as to whether Hernandez would agree that Amatorio's conduct with respect to his immigration filings was undertaken entirely for Hernandez's benefit, considering that "Hernandez has alleged that Amatorio's use of the immigration process was for the purpose of making

24

Hernandez work when he did not want to." *Id.* "That does not sound like a use of the immigration process for Hernandez's benefit." *Id.* Likewise, given Ms. Salcedo's detailed allegations which comprise her Second Amended Complaint against Mr. Amatorio and the other Defendants charging them with having abused and misused the immigration process to wrongfully obtain her labor, we find plenty to support her claim that she was a victim of their threats. We reject this argument interposed once again by Mr. Amatorio.

## 2.  FAILURE TO ALLEGE "SERIOUS HARM"

Next, Mr. Amatorio maintains that Ms. Salcedo has failed to sufficiently state cognizable claims under 18 U.S.C. § 1589(a)(2) and 18 U.S.C. § 1589(a)(4), given that each statute requires an allegation of "serious harm," which cannot be satisfied only by threats of deportation. In support of this argument, Mr. Amatorio cites to *United States v. Law*, 990 F.3d 1058 (7th Cir. 2021), which upheld a criminal conviction for forced labor, in violation of 18 U.S.C. § 1589(a)(2). In that case, the Seventh Circuit explained that "in certain contexts, threats to one's immigration status can constitute serious harm. For instance, confiscating an immigrant's passport meets this threshold." *Law*, 990 F.3d at 1064. The Seventh Circuit commented that "[t]he Second Circuit has . . . observed that [even] threats of deportation can, combined with other circumstances, also constitute a serious harm." *Id.* (citing *Adia v. Grandeur Mgmt.*, 933 F.3d 89, 93 (2d Cir. 2019)). In *United States v. Law*, *supra*, the defendant had confiscated the victims' passports and "subjected them to nearly constant threats of deportation." *Id.* This, in addition to the financial threats and psychological harm inflicted upon the victims, prompted the Seventh

Circuit to rule that "a rational jury could conclude that [the defendant] was guilty beyond a reasonable doubt of trafficking with respect to forced labor in violation of 18 U.S.C. § 1589." *Id.* at 1065. We find no authority in this ruling, as Mr. Amatorio argues, for the view that threats of deportation can never qualify as "serious harm." Moreover, the context of the Seventh Circuit's decision in *Law*—which was an appeal from a criminal conviction—is easily distinguishable from the pleading standards in a civil case, such as the one before us here.

Mr. Amatorio cites *United States v. Calimlim*, 538 F.3d 706 (2008), another Seventh Circuit decision upholding a criminal conviction arising under 18 U.S.C. § 1589. In that case, the Seventh Circuit found no plain error based on a jury instruction that stated: "Warnings of legitimate but adverse consequences or credible threats of deportation, standing alone, are not sufficient to violate the forced labor statute." *Id.* at 714. The Seventh Circuit concluded that, "in the context of the whole discussion, the meaning of that phrase is plain. This instruction effectively alerted the jury to the *scienter* that the Government had to prove beyond a reasonable doubt." *Id.* Whether threats of deportation alone satisfy the requirements for a criminal conviction under 18 U.S.C. § 1589 is an entirely separate question from whether a civil plaintiff's allegations that mirror such claims survive a Rule 12(b)(6) motion to dismiss. At this stage, we will not hold that alleged threats of deportation are always insufficient to constitute "serious harm" within the meaning of a civil cause of action under the TVPA.

In making this determination, we rely on the statutory definition of the term "serious harm," which includes "any harm, whether physical or nonphysical, including

psychological, financial, or reputational harm, that is sufficiently serious, under all the surrounding circumstances, to compel a reasonable person of the same background and in the same circumstances to perform or to continue performing labor or services in order to avoid incurring that harm." 18 U.S.C. § 1589(c)(2). As our court recently ruled in a similar case that also was brought against RN Staff, this definition "compels a factual determination." *Dinsay v. RN Staff Inc.*, 2021 WL 2042097, at *5 (S.D. Ind. May 21, 2021). Thus, summary judgment was foreclosed by unresolved factual issues as to whether Mr. Villegas had threatened that RN Staff would withdraw its immigration sponsorship the plaintiff. *Id.* As explained there:

> The facts presented by Dinsay suggest that RN Staff obtained the labor of Dinsay by means of threats of serious harm when considering the full context of Villegas' threats to Dinsay about her immigrant petition and RN Staff's compliance with the [USCIS's requests for evidence regarding the Form I-140 petition filed by RN Staff on Dinsay's behalf]. . . . Within context, Villegas' threat could be viewed as a subtle psychological method of coercion to retain Dinsay's labor rather than simply a factual statement of what would happen if RN Staff withdrew its immigration sponsorship. On the other hand, RN Staff has designated evidence that the conversation never happened, and Dinsay was not threatened regarding her immigrant petition. This factual dispute must be decided by a trier of fact, not by the Court on summary judgment.

*Id.* In sum, as we have concluded previously in similar circumstances, evidence of a threat to withdraw sponsorship of a plaintiff's immigration petition precludes summary judgment on an 18 U.S.C. § 1589 claim. Allegations of immigration harm and threats of deportation are enough to survive a motion to dismiss. "Other courts have [also] found that threats of deportation 'can constitute serious harm to an immigrant within the meaning of the forced labor statute,' or even alone can create a disputed issue of material

fact about whether defendants abused the law or legal process or engaged in a scheme to mislead a [TVPA plaintiff]." *Mouloki v. Epee*, 262 F.Supp.3d 684, 697 (N.D. Ill. 2017) (citing *Elat v. Ngoubene*, 993 F.Supp.2d 497, 523 (D. Md. 2014); *Aguirre v. Best Care Agency, Inc.*, 961 F.Supp.2d 427, 444−45 (E.D.N.Y. 2013)); *see also United States v. Kalu*, 791 F.3d 1194, 1212 (10th Cir. 2015).

We hold that Ms. Salcedo has adequately alleged "serious harm" within the meaning of the TVPA, given her additional claims of financial harm—specifically, the requirement in her employment agreement that she must pay RN Staff $20,000 in liquidated damages if she left her employment early. "[T]hreatened financial harm may constitute a type of 'serious harm' for purposes of the TVPA." *Panwar v. Access Therapies, Inc.*, 975 F.Supp.2d 948, 958 (S.D. Ind. 2013). In *Panwar*, we considered a motion to dismiss in another case, again brought against RN Staff, in which the plaintiff had alleged that he was required "to pay the Defendants $20,000.00 if he terminated his employment prior to the end of the term of the Employment Agreement and [Defendants] threatened to revoke his visa if he continued to inquire about his placement or wages." *Id.* at 957. We ruled that this claim sufficed to allege "serious harm" under the TVPA. *Id.* at 958; *see also United States v. Dann*, 652 F.3d 1160, 1170−71 (9th Cir. 2011) (holding that an employer's threat that a foreign worker would owe $8,000 if she quit constituted threat of "serious harm" under the TVPA); *Nunag–Tanedo v. E. Baton Rouge Par. Sch. Bd.*, 790 F.Supp.2d 1134, 1146 (C.D. Cal. 2011) (threatened payment of $10,000 constitutes threat of serious harm); *Paguirigan v. Prompt Nursing Emp. Agency LLC*, 286 F.Supp.3d 430, 438 (E.D.N.Y 2017) ("Here, plaintiff alleges that she was not only

threatened with the prospect of paying a $25,000 contract termination fee—more than

three times the amount threatened in *Dann*—she also was actually sued for recovery of

both the $25,000 fee and $250,000 in tort damages. Allegations of such a severe

financial burden are more than enough to rise to the level of harm necessary to state a

TVPA claim.").

Thus, we reject Mr. Amatorio's argument that Ms. Salcedo has failed to allege the

threat of "serious harm" within the meaning of 18 U.S.C. § 1589(c)(2). In addition to

having adequately alleged threats of "serious harm" under 18 U.S.C. § 1589(a)(2), she

has adequately alleged a claim under 18 U.S.C. § 1589(a)(4), that is, a scheme, plan, or

pattern intended to cause Ms. Salcedo to believe that, if she did not continue her

employment, she would suffer this serious harm.

### 3.  ABUSE OR MISUSE OF LEGAL PROCESS

Ms. Salcedo's allegations center on 18 U.S.C. § 1589(a)(3)— the "abuse or threatened

abuse of law or legal process" prong. Curiously, Mr. Amatorio interposes only one

specific argument challenging this claim, to wit, to Paragraph 83 of the Second Amended

Complaint, which states: "Haskins relayed to Plaintiff all the legal opinions by Amatorio

in connection with Plaintiff's alleged ability to *legally continue working* for RN Staff

despite the denial of her Form I-485 adjustment and in connection with the re-filing of a

second Form I-485 adjustment application." Docket No. 50, at 7. Mr. Amatorio maintains

that "[t]here was no legal process employed. And the allegation states that Plaintiff was

made to believe that it was legal to continue working – that it was safe to work. That is the exact opposite of exerting pressure to force her to work." *Id.*

Title 18 U.S.C. § 1589(c)(1) defines the phrase, "by means of the abuse or threatened abuse of law or legal process," as entailing the use or threatened use of "a law or legal process, whether administrative, civil, or criminal, in any manner or for any purpose for which the law was not designed, in order to exert pressure on another person to cause that person to take some action or refrain from taking some action." 18 U.S.C. § 1589(c)(1). Ms. Salcedo thus claims in her Second Amended Complaint that Defendants induced her to continue working for RN Staff by assuring her that if she did, Defendants would file another round of immigration forms on her behalf. If she did not continue working for RN Staff, however, Defendants would not file these forms and she would be subject to deportation. These allegations fit comfortably within the definition of the "abuse or threatened abuse of law or legal process."

In *Hernandez v. RN Staff Inc.,* (cited previously) we considered similar allegations against Mr. Amatorio and RN Staff, finding they plausibly averred a violation of § 1589(a)(3). 2021 WL 2012657 at *3. We specifically ruled that "Amatorio's alleged acts of making knowingly futile immigration-related filings and lying to Hernandez about his work authorization, both to keep Hernandez working at RN Staff even when he wanted to leave, constitute 'the use . . . of a law or legal process . . . for any purpose for which' the immigration laws were 'not designed, in order to exert pressure on' Hernandez to cause him to 'refrain from' quitting work." *Id.* (quoting 18 U.S.C. § 1589(c)(1)). We further held that "threats of causing negative immigration consequences that are used to obtain a

person's continued labor can violate § 1589(a)(3)." *Id.*; *see also Panwar*, 975 F.Supp.2d at 958 ($20,000 early contract termination fee and threat of causing plaintiff's visa to be revoked plausibly constituted violation of § 1589(a)(3)); *Adia*, 933 F.3d at 93 (threat to expose plaintiff to deportation plausibly constituted violation of § 1589(a)(3)); *Nunag–Tanedo*, 790 F.Supp.2d at 1144−46 (plaintiffs stated TVPA claim where defendants threated to deport plaintiffs or let their visas expire if they stopped working); *United States v. Kozminski*, 487 U.S. 931, 948 (1988) (concluding under a similar statute that "threatening . . . an immigrant with deportation could constitute the threat of legal coercion that induces involuntary servitude").[3]

Again, we hold that Ms. Salcedo has adequately alleged claims under 18 U.S.C. § 1589(a)(2), 18 U.S.C. § 1589(a)(3), and 18 U.S.C. § 1589(a)(4), and that dismissal of these claims would be both ill-advised and inappropriate.

### i.   CONSPIRACY CLAIM

Although Mr. Amatorio seeks the dismissal of the entirety of the Second Amended Complaint, he directs no argument specifically to Ms. Salcedo's conspiracy claim under 18 U.S.C. § 1594, which alleges that Defendants conspired with one another to violate 18

---

[3] "This is not to say that an employer automatically violates the TVPA by acknowledging the adverse immigration consequences that might befall an employee who is terminated." *Camayo v. John Peroulis & Sons Sheep, Inc.*, 2012 WL 4359086, at *5 n.6 (D. Colo. Sept. 24, 2012). "Certainly, the TVPA was not intended to completely muzzle employers or prohibit them from mentioning certain legal realities." *Id.* Rather, whether statements (and actions) by Defendants "must be viewed in light of all the surrounding circumstances, and thus, resolution of whether a certain statement amounts to an abuse of the legal process is [a question] that is particularly difficult on the sparse record of a motion to dismiss." *Id.*

U.S.C. § 1589. Even if Mr. Amatorio had advanced a proper challenge to this claim, it would have been unavailing. We have previously rejected each of Mr. Amatorio's challenges to the underlying 18 U.S.C. § 1589 claim, and we find that Ms. Salcedo has also sufficiently alleged an agreement by which Defendants, including Mr. Amatorio, conspired to violate the forced labor provision of the TVPA.

### C. SUBJECT MATTER JURISDICTION

In his last challenge to the Second Amended Complaint, Mr. Amatorio claims that Ms. Salcedo's legal malpractice claim must be dismissed for want of subject matter jurisdiction. "Federal Rule of Civil Procedure 12(b)(1) allows a party to move to dismiss a claim for lack of subject matter jurisdiction." *Babchuk v. Ind. Univ. Health, Inc.*, 299 F.R.D. 591, 592 (S.D. Ind. 2014) (quoting *Hallinan v. Fraternal Order of Police of Chi. Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009)). In support of his 12(b)(1) argument, Mr. Amatorio relies on *Gunn v. Minton*, 568 U.S. 251 (2013), in which (he claims) the Supreme Court held that district courts do not have jurisdiction over malpractice suits. However, the Supreme Court in *Gunn* was determining "whether a state law claim alleging legal malpractice in the handling of a patent case must be brought in federal court" based on federal courts' "exclusive jurisdiction over cases 'arising under any Act of Congress relating to patents.'" *Id.* at 253 (citing 28 U.S.C. § 1338(a)). The Supreme Court in *Gunn* concluded that 28 U.S.C. § 1338 does not deprive the state courts of subject matter jurisdiction over such a legal malpractice claim—an entirely opposite conclusion from that represented by Mr. Amatorio to the Court. *Id*. at 265. Mr. Amatorio's

invocation of *Gunn* is entirely inapt and his reliance on this case as precedent is entirely misplaced.

The case before us is premised on federal question jurisdiction (28 U.S.C. § 1331), which sets the stage for a proper exercise of supplemental jurisdiction over the state law claim based on alleged legal malpractice. *See Hay v. Ind. State Bd. of Tax Comm'rs*, 312 F.3d 876, 879 (7th Cir. 2002) ("Jurisdiction is the 'power to declare law,' and without it the federal courts cannot proceed. Accordingly, not only may the federal courts police subject matter jurisdiction *sua sponte*, they must."). 28 U.S.C. § 1367(a) allows an exercise of supplemental jurisdiction over claims that are so closely related to the federal claims in the action arising under our original jurisdiction that they form a part of the same case or controversy, that is, where the state claims "derive from a common nucleus of operative fact" with the original federal claims, such that the relationship between the federal claims and the state claim permits the conclusion that the entire action comprises one constitutional "case." *Wisconsin v. Ho-Chunk Nation*, 512 F.3d 921, 936 (7th Cir. 2008) (quoting *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 500 (7th Cir. 1999)); *City of Chi. v. Int'l Coll. of Surgeons*, 522 U.S. 156, 164–65 (1997) (quoting *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966)).

Here, Ms. Salcedo's legal malpractice claim constitutes an integral part of her overall case or controversy based on her federal claims against Mr. Amatorio, allowing for a proper exercise of supplemental jurisdiction by our court. *See Duro, Inc. v. Walton*, 43 F.4th 648, 671 (7th Cir. 2022) (holding that an Indiana legal malpractice claim "falls within the federal courts' supplemental jurisdiction under 28 U.S.C. § 1367(a).").

## III.    CONCLUSION

For theses reasons, Mr. Amatorio's Second Motion to Dismiss Plaintiff's Second

Amended Complaint [Docket No. 50] is **DENIED**.

IT IS SO ORDERED.

Date:    3/8/2023

_Sarah Evans Barker_

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Arvin G. Amatorio
ARVIN AMATORIO PC
aga@amatoriolaw.com

Bryce H. Bennett, Jr.
RILEY BENNETT EGLOFF LLP
bbennett@rbelaw.com

Patrick Stephen McCarney
RILEY BENNETT EGLOFF LLP
pmccarney@rbelaw.com

Felix Vinluan
Law Office of Felix Vinluan
fqvinluan@yahoo.com